# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANNA HOOD; LYNN HOOD; RICHARD
HOOD,
              *Plaintiffs-Appellants,*

              v.

ENCINITAS UNION SCHOOL DISTRICT
and DOES 1-10,*
              *Defendants-Appellees.*

No. 04-57007

D.C. No.
CV-03-00778-RTB

OPINION

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted
November 17, 2006—Pasadena, California

Filed April 9, 2007

Before: Cornelia G. Kennedy,** Cynthia Holcomb Hall, and
Michael Daly Hawkins, Circuit Judges.

Opinion by Judge Kennedy

---

*The complaint and notice of appeal list Does 1-10 as additional defendants in the case. However, the complaint does not identify harms committed by Does 1-10 with any specificity, the district court does not include any individuals or any Does 1-10 in its case caption, and the briefs before this court do not contain any reference to Does 1-10. Thus, the substance of this opinion pertains to the Hoods' claims against the Encinitas Union School District.

** The Honorable Cornelia G. Kennedy, Senior Judge for the Sixth Circuit Court of Appeals, sitting by designation.

## COUNSEL

Eric B. Freedus (briefed and argued), Frank and Freedus, A P.C., San Diego, California, for the plaintiffs-appellants.

Paul V. Carelli (briefed) and Jack M. Sleeth, Jr. (argued), Stutz, Artiano, Shinoff & Holtz, A P.C., San Diego, California, for the defendant-appellee.

**OPINION**

KENNEDY, Senior Circuit Judge:

Anna Hood and her parents (hereinafter "appellants" or "the Hoods") brought this claim alleging that the Encinitas Union School District (hereinafter "appellee" or "the school district") violated the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1419 (2000), by refusing to provide Anna with special education services. This claim seeks reimbursement for private school education that the Hoods obtained for Anna after withdrawing her from the public school system. A California special education hearing officer denied the Hoods relief, and the district court affirmed.

On appeal, the Hoods offer two grounds under which Anna should be categorized as a child with a disability per 20 U.S.C. § 1401(3) and is therefore entitled to special education. First, they assert that Anna has a "specific learning disability" because she exhibits a severe discrepancy between her achievement and intellectual ability in one or more of the academic areas enumerated in Cal. Educ. Code § 56337 (2002), as calculated per the formula provided in Cal. Code Regs. tit. 5, § 3030(j)(4)(A) (2002), and the discrepancy cannot be corrected through other regular or categorical services offered within the regular instructional program. Second, they assert that Anna has "other health impairments" under 20 U.S.C. § 1401(3)(A) and Cal. Code Regs. tit. 5, § 3030(f). The Hoods argue that Anna, by reason of either her "specific learning disability" or her "other health impairments," needs special education and related services. They seek to obtain reimbursement for the expenses they incurred for private school education, which the Hoods commenced during Anna's fifth grade 2001-2002 school year following the school district's determination that Anna was ineligible for special education, as well as recoupment of fees and costs related to this action.

After reviewing the evidence before the hearing officer and additional evidence submitted to the district court, we find that the district court's acceptance of the hearing officer's determination that Anna was not legally entitled to receive publically-funded special education was not in clear error. As a result, we affirm.

## BACKGROUND

At the time the California special education hearing officer issued a decision, Anna Hood was 10 years old and, according to her report cards, was performing at grade-level appropriate/average or above average levels in the public school classroom.[1] While Anna's second, third, fourth, and fifth grade reports chronicle her consistent difficulties completing tasks, turning in homework on time, and keeping her belongings organized, Anna's scores on the Stanford Achievement Test (SAT-9) have placed her above the fiftieth percentile with near uniformity.

Meanwhile, Anna's performance on various intelligence tests indicates high intellectual ability. Anna's scores on the Woodson-Johnson Test of Achievement-III, administered by resource specialist Patricia Hotz, measured Anna's achievement in eleven different areas, and in all but one area, Anna's scores were average or better. One (writing sample) was in the "very superior" range, eight were in the "high average" range, one (reading fluency) was in the "average" range, and one (math fluency) was in the "low average" range. She received a Wechsler Intelligence Scale for Children-III verbal score of 127, performance score of 110, and full scale score of 121, as reported by school psychologist Susan Jordan. Anna's consulting neuropsychologist Nancy Markel adminis-

---

[1]Anna did receive a "D+" academic score and an "S-" effort score in spelling for her third term of the fourth grade, and her third grade report card also indicates a "needs to improve" mark in cursive, but these instances of low performance are anomalous.

tered the Comprehensive Test of Nonverbal Intelligence, which produced a geometric I.Q. score of 136, a pictorial I.Q. score of 121, and a nonverbal I.Q. score of 131. These scores place her ability above average.

Anna has been the subject of a number of medical assessments. She was born following a difficult pregnancy and has a significant medical history, which includes multiple ear infections that required tube placement, as well as far-sightedness and strabismus. In January 2001, Dr. Joseph Gleeson, a pediatric neurologist, upon reviewing the results of a previously administered electroencephalogram, interpreted Anna's condition as consistent with a possible seizure disorder and prescribed medication accordingly. His letter also noted a significant family history of seizures. After examining Anna, Dr. Gleeson suspected that Anna had the same condition as her older brother, though he expressed that it was "not entirely clear" that Anna was having seizures. Dr. Gleeson viewed such a seizure disorder as an explanation of Anna's apparent spells of distractibility and tendency to miss things that had happened.

After a subsequent visit with Anna in April 2001, Dr. Gleeson, stated unequivocally that Anna "had an EEG that had significant abnormalities consistent with epilepsy" and observed that Anna suffered from "increasing distractibility and difficulty staying on task that appeared to come in spells." He recommended that Anna be evaluated for a possible attention deficit disorder because of her reported difficulties staying on task and her increased distractibility. Anna eventually began taking medication for the attention problem.

Prompted by the receipt of Dr. Gleeson's initial report, the school district instituted an accommodation plan in accordance with Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, in February 2001.[2] The plan included preferen-

_____

[2]Appellants assert that "Anna was only able to achieve roughly average grades" "[d]espite years of accommodations through a '504 Plan.' " How-

tial seating in the classroom, use of a graphic organizer and AlphaSmart keyboard, one-step directions, visual support for instruction and concepts, frequent prompts and checks for understanding, and daily teacher checks for homework assignments.

On May 15, 2001, Anna's advocate, Sara Frampton, wrote to the district to request a special education evaluation. In this letter, Frampton acknowledged that "[Anna] ha[d] recently been offered a 504 plan" but expressed her concern that the plan had "not been based on a thorough assessment in all areas of potential or suspected disability." The district's psycho-educational assessment, performed by resource specialist Patricia Hotz and school psychologist Susan Jordan in August and September 2001, included a battery of tests and classroom observations. Jordan and Hotz ultimately issued a report explicitly stating that "Anna has been diagnosed with [a] Seizure Disorder . . . for which she takes medication" and "[Anna's] Seizure Disorder adversely affects her ability to focus and pay attention in the regular classroom." However, Jordan and Hotz concluded that "[b]ased on State and Federal guidelines, Anna does not qualify for Special Education services at this time, as she is performing at least in the *average range* academically, both in the classroom and in one-on-one testing." Additionally, the report noted Anna's eligibility for a Section 504 accommodation plan to assist Anna's functioning in the regular classroom and advised that the IEP team consider all information when determining eligibility, class placement, and goals for Anna.

_____

ever, February 12, 2001, marks the earliest documentation of a Section 504 plan contained within the record, indicating that the district only had the benefit of eight months of experience with the Section 504 plan, interrupted by a summer break, prior to the Individualized Education Plan (IEP) meeting, at which it denied Anna special education eligibility. Appellants became convinced of the Section 504 plan's insufficience and removed Anna from school after the plan had been in place for only one year and just two months after it had been modified at appellants' request.

On October 5, 2001, Jordan and Hotz convened with Anna's general education teacher, advocate, and mother for an IEP meeting. The school district determined that Anna did not qualify for special education services, specifically concluding that "Anna does not have a learning disability."

In December 2001, the school district reevaluated the Section 504 plan in place and determined that it should be continued, changing it only to add an accommodation addressing Anna's mother's concern about her daughter's self-esteem. Dissatisfied with the school district's provision of services, Anna's parents withdrew their daughter from the school district in February 2002, enrolled her in The Winston School, a private school for children with learning differences, and appealed to the California Special Education Hearing Office, seeking to recover the amounts expended for tuition and assessments.[3]

## PROCEDURAL HISTORY

On February 25, 2003, a hearing commenced before an officer of the California Special Education Hearing Office. There, the school district had the burden of proving compliance with IDEA. *Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1498 (9th Cir. 1996). After presiding over four days of the presentation of oral and documentary evidence, the hearing officer was persuaded that Anna's impairments did not necessitate special education or related services. The officer determined that the school district did not violate IDEA and denied reimbursement to Anna's parents for their child's private placement. The hearing officer found that, in general, the results of Anna's testing did not reveal a discrepancy equal to or greater than 1.5 standard deviations, the regulatory measure of a discrepancy that is severe. *See* Cal. Code Regs. tit. 5,

---

[3]When Anna entered middle school in September 2003, she transitioned from Encinitas Union to the San Dieguito Unified High School District, where she was found to be eligible for special education.

§ 3030(j)(4)(A). While he did find that a particular math fluency score might support the finding of a severe discrepancy, he dismissed the issue based on Section 3030(j)(4)(A)'s instructions that no single score or product of scores shall be used as the sole criterion and that a discrepancy may only be considered a severe discrepancy when it is corroborated by other assessment data. Ultimately, the hearing officer concluded that the totality of the evidence, including Anna's work samples, scores from other tests, and classroom observations, provided a reasonable basis for the school district to determine that Anna's specific learning disability did not require special education. The hearing officer also found that Anna did not have any "other health impairments" to potentially qualify her for special education services under 20 U.S.C. § 1401(3)(A), concluding that Anna's evidence of seizure disorder or attention deficit disorder did not bring her under the auspices of the statute. While the officer noted that Anna exhibited difficulty organizing and focusing on her work, he expressed that "[i]t was not clear from the evidence whether Anna's difficulties with attention and organization were due to the seizure disorder, an attention deficit disorder, or something else." Additionally, he felt he could not conclude whether the seizure disorder and/or attention deficit disorder "actually caused Anna to have limited strength, vitality or alertness," as required by regulation. *See* Cal. Code Regs. tit. 5, § 3030(f). Based on these deficiencies, the hearing officer determined that the district had met its burden of proving IDEA compliance because the evidence did not establish that Anna met the eligibility criteria for possessing any "other health impairments," and accordingly, he denied relief.

Pursuant to 20 U.S.C. § 1415(i)(2), the Hoods sought to enforce their IDEA rights in federal court. The burden of proof in the district court rested with the Hoods as the party challenging the administrative decision. *Clyde K. v. Puyallup Sch. Dist., No. 3*, 35 F.3d 1396, 1399 (9th Cir. 1994), *superseded by statute on other grounds*, Individuals with Disabilities in Education Act, Pub. L. No. 105-17, 111 Stat. 37, *as*

*recognized in M.L. v. Fed. Way Sch. Dist.*, 341 F.3d 1052, 1063 n.7 (9th Cir. 2003). The district court upheld the California Special Education Hearing Office's decision that the school district's refusal to afford Anna special education did not violate the law. The court based its decision on the conclusion that the Hoods had not shown that Anna's discrepancy "[could ]not be corrected through other regular or categorical services offered within the regular instructional program," rejecting the Hoods' argument that the hearing officer employed the incorrect standard to determine whether the discrepancy could be corrected. *See* Cal. Educ. Code § 56337(c) (2003). It found that the hearing officer explicitly cited Section 56337(c) and stated that he "was not convinced" that "the discrepancies could not be corrected through the services offered within the regular instruction program." In deciding the issue of the "specific learning disability" on those grounds, the court refrained from determining whether Anna exhibited a discrepancy between her ability and performance that rose to the level of "severe" under the calculations prescribed in § 3030(j)(4)(A) and accepted appellee's assertion that Anna's learning disability could be addressed with modifications to the regular classroom programming.

The district court also approved of the hearing officer's conclusion that the Hoods had not shown that Anna's discrepancy, even if severe, was beyond correction in the normal classroom. The district court emphasized that the language of the statute necessitates measurement of the discrepancy between ability and achievement over time, and thus an isolated assessment of the difference between Anna's ability and achievement could not suffice.

The district court also rejected the argument that Anna experienced some "other health impairment" that would qualify her for special education under 20 U.S.C. § 1401(3)(A). It explained that the hearing officer's conclusion that Anna was not eligible under the "other health impairments" provision

was supported by record evidence and the testimony of witnesses.

## STANDARD OF REVIEW

This court uses a clear error standard to review the district court's findings of fact even when they are based on the written record of administrative proceedings. *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1310 (9th Cir. 1987). "A finding of fact is clearly erroneous when the evidence in the record supports the finding but the reviewing court is left with a definite and firm conviction that a mistake has been committed." *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 887 (9th Cir. 2001) (internal quotations omitted)

This court reviews questions of law and mixed questions of fact and law de novo unless the mixed question is primarily factual. *Gregory K.*, 811 F.2d at 1310.[4] "Because Congress intended states to have the primary responsibility of formulating each individual child's education, this court must defer to their 'specialized knowledge and experience' by giving 'due weight' to the decisions of the states' administrative bodies." *Amanda J.*, 267 F.3d at 888 (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-08 (1982)). The "thorough and careful" findings of a hearing officer are entitled to deference. *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994).

---

[4]Although appellant argues for de novo review, the fact-intensive nature of a special education eligibility determination coupled with considerations of judicial economy render a more deferential approach appropriate. This court employed a clear error standard to review a district court's ruling that a child was not disabled in *Kelby v. Morgan Hill Unified School District*, reasoning that such a determination was primarily factual. No. 91-15419, 1992 U.S. App. LEXIS 6581, at *4 (9th Cir. Apr. 1, 1992) (citing *Gregory K.*, 811 F.2d at 1311, 1312 for the proposition that the "question whether [a] student has a learning disability or is mentally retarded is reviewed for clear error").

## DISCUSSION

### I. "Specific Learning Disability"

[1] Upon review of the record, hearing officer's opinion, and appellate briefs, we conclude that the district court did not clearly err in determining that Anna was not legally entitled to special education based on a "specific learning disability." IDEA provides qualified disabled children with access to a free appropriate public education that includes an individualized education program tailored to the child's unique needs.[5] Section 1401(3) defines, in relevant part, a "child with a disability" to include a child "(i) with . . . other health impairments, or specific learning disabilities; and (ii) who, by reason thereof, needs special education and related services." Section 56337 of the California Education Code clarifies "specific learning disability" as follows:[6]

> A pupil shall be assessed as having a specific learning disability which makes him or her eligible for special education and related services when it is determined that all the following exist:

---

[5]IDEA specifies that the term "specific learning disability . . . does not include a learning problem that is primarily the result of visual, hearing, or motor disabilities, of mental retardation, of emotional disturbance, or of environmental, cultural, or economic disadvantage." 20 U.S.C. § 1401(26)(2000) (to be re-codified at 20 U.S.C. § 1401 (30)).

[6]Subsequent to the hearing officer's ruling, Congress passed a law, effective July 1, 2005, stating that in determining whether a child has a "specific learning disability," a school district "shall not be required to take into consideration whether a child has a severe discrepancy between achievement and intellectual ability. . . ." Pub. L. No. 108-446, § 614(b)(6)(A), 118 Stat. 2647, 2706 (2004) (to be codified at 20 U.S.C. § 1414(b)(6)(A)). The California Education Code has also been revised to mimic these changes. Cal. Educ. Code § 56337(b) (2006). However, as there is no indication that retroactive application was intended, and the district court applied the law as it was written prior to the amendment, we do the same in the context of our review.

(a) A severe discrepancy exists between the intellectual ability and achievements in one or more of the following academic areas:

(1) Oral expression.

(2) Learning comprehension.

(3) Written expression.

(4) Basic reading skills.

(5) Reading comprehension.

(6) Mathematics calculation.

(7) Mathematics reasoning.

(b) The discrepancy is due to a disorder in one or more of the basic psychological processes and is not the result of environmental, cultural, or economic disadvantages.

(c) The discrepancy cannot be corrected through other regular or categorical services offered within the regular instructional program.

**[2]** Title 5, Section 3030(j)(4)(A) of the California Code of Regulations provides the calculation relevant for determining whether a discrepancy is severe:

When standardized tests are considered to be valid for a specific pupil, a severe discrepancy is demonstrated by: first, converting into common standard scores, using a mean of 100 and standard deviation of 15, the achievement test score and the ability test score to be compared; second, computing the difference between these common standard scores; and

third, comparing this computed difference to the standard criterion which is the product of 1.5 multiplied by the standard deviation of the distribution of computed differences of students taking these achievement and ability tests. A computed difference which equals or exceeds the standard criterion, adjusted by one standard error of measurement, the adjustment not to exceed 4 common standard score points, indicates a severe discrepancy . . . ."

However, Section 3030(j)(4)(A) avoids total reliance on a mathematical calculation by immediately adding to the above passage that the calculation indicates a severe discrepancy only "when such discrepancy is corroborated by other assessment data which may include other tests, scales, instruments, observations and work samples, as appropriate."

[3] The federal district court, the hearing officer, and the school district itself each based its decision regarding the severity of the discrepancy on factors other than the Section 3030 calculation. The district court expressly stated that "[f]ortunately for this Court, this Court need not attempt to assess the accuracy of either side's § 3030(j) calculation . . . because both sides ultimately focus on the last part of the § 56337 test[,]" that is, whether the discrepancy could be corrected in the general classroom. The hearing officer examined the correctability issue and also looked to the need for corroborating evidence to support the raw mathematical data. According to the hearing officer's opinion, the school district's denial of Anna's eligibility for special education was justified because "Anna's overall performance, including classroom achievement, grades and SAT-9 testing, not only failed to provide the necessary corroboration, but also demonstrated that she did not require special education."

The school district's appellate brief takes issue with aspects of the calculation, essentially arguing that the appellants oversimplified the regulation's prescribed computation by failing

to consider the degree to which students' scores generally differ between the ability and achievement tests employed, that is, the success of the intelligence test at predicting actual performance. However, because the school district asserted agreement at oral argument that Anna's scores satisfied the mathematical standard for a severe discrepancy, we will interpret their argument to concede this issue.

**[4]** We need not consider whether Anna satisfies the calculation. Our decision hinges upon appellants' failure to satisfy the second requirement of the "specific learning disability" qualification for special education eligibility, that being whether any existing severe discrepancy between ability and achievement "[could] not be corrected through other regular or categorical services offered within the regular instructional program." Cal. Educ. Code § 56337. Thus, even assuming the existence of a severe discrepancy, the law does not entitle Anna Hood to special education if we find that her discrepancy can be corrected in the regular classroom.

The Hoods argue that the hearing officer employed the wrong standard for assessing correctability and claim that the district court "cherry-picked" language to justify a conclusion that he applied the correct legal standard. On appeal, the Hoods cite district court cases from other circuits to argue that the ability to pass from grade to grade, or progress in the general curriculum, or exhibit average performance relative to peers is not sufficient to render a child ineligible for IDEA benefits. But these cases do not address California's "correctability" prong and thus offer limited guidance regarding whether a student's severe discrepancy is correctable in the regular classroom environment. Moreover, even the cases the Hoods cite permit districts to consider a student's relative performance as one factor in an eligibility inquiry. *See, e.g., Corchado v. Bd. of Educ. Rochester City Sch. Dist.*, 86 F. Supp. 2d 168, 176 (W.D.N.Y. 2000). However, the Hoods' brief offers no case law in support of the standard that it proposes for judging correctability, that is, whether instruction offered

in the general classroom will narrow the mathematical discrepancy between the student's own achievement and intellectual potential.

Unpublished cases within this jurisdiction, classic IDEA jurisprudence, and administrative decisions prove useful when contemplating the standard appropriate to assess "correctability" and factors informative to the determination of whether the standard is satisfied.[7] In *Norton*, an opinion examining the eligibility of a student purportedly exhibiting a severe discrepancy between ability and achievement, this court stated that, to satisfy the "correctability" prong, the parents had to show that the student in question "was not benefitting from his regular classroom environment, which, for [him], included the special modifications implemented by the school district . . . ." *Norton v. Orinda Union Sch. Dist.*, No. 97-17029, 1999 U.S. App. LEXIS 3121, at \*7 (9th Cir. Feb. 25, 1999). Thus, this court equated "benefitting" with "correctable." Additionally, in *Kelby*, this court noted that denial of special education was appropriate because "[t]he preponderance of the evidence support[ed] the finding that [the child]'s learning difficulties [were] not so severe that he [could ]not benefit adequately from the regular educational program." *Kelby*, 1992 U.S. App. LEXIS 6581, at \*9. The California Court of Appeals shed light on what might be considered in this determination, referring to the student's school attendance at an "appropriate grade level" and achievement of "respectable grades" as indicative of his failure to satisfy the Section 56337 standard. *In re Lennie J.*, No. B173741, 2005 Cal. App. Unpub. LEXIS 2101 (Cal. Ct. App. Mar. 8, 2005), at \*14.

**[5]** These Section 56337 cases are especially informative in

---

[7]Ninth Circuit Rule 36-3(a), promulgated under the authority of the Federal Rules of Appellate Procedure, indicates that "[u]npublished dispositions and orders of this Court are not precedent, except when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion."

light of their compatibility with broader IDEA jurisprudence. For example, in *Rowley*, the paradigm IDEA case, the Supreme Court determined that the state satisfies the requirement to provide a handicapped child with a "free appropriate public education" by providing "personalized instruction with sufficient support services to permit the child *to benefit* educationally from that instruction." *Rowley*, 458 U.S. at 203 (emphasis added). While it is true that the *Rowley* case dealt with the level of services that must be provided to a student already deemed eligible for special education, rather than special education eligibility itself, courts within this circuit have characterized the "benefit" standard articulated in *Rowley* as the "traditional federal standard under IDEA." *Scanlon by Birkner v. San Francisco Unified Sch. Dist.*, No. C 91-2559 FMS, 1994 U.S. Dist. LEXIS 4817, (N.D. Cal. Apr. 14, 1994), *aff'd*, No. 94-15822, No. 16792, 1995 U.S. App. LEXIS 31594 (9th Cir. Oct. 30, 1995). This court has emphasized that "states are obligated to provide 'a basic floor of opportunity' through a program 'individually designed to provide educational benefit to a handicapped child,' " rather than "potential-maximizing" education. *Ash v. Lake Oswego Sch. Dist., No. 7J*, 980 F.2d 585, 587 (9th Cir. 1991) (citing *Gregory K.*, 811 F.2d at 314). The Supreme Court explicitly stated in *Rowley* that IDEA does not contain a requirement "that the services so provided be sufficient to maximize each child's potential commensurate with the opportunity provided other children." *Rowley,* 458 U.S. at 198 (internal quotations omitted). Just as courts look to the ability of a disabled child to benefit from the services provided to determine if that child is receiving an adequate special education, it is appropriate for courts to determine if a child classified as non-disabled is receiving adequate accommodations in the general classroom —and thus is not entitled to special education services—using the benefit standard. Accordingly, the district court used the correct standard of review when it considered the benefit Anna received in the regular classroom as part of its eligibility analysis.

The Supreme Court in *Rowley* elaborated that "if the child is being educated in the regular classrooms of the public education system, [an IEP] should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Id.* at 204. The Court was careful to provide in a footnote that it did not intend to suggest that advancement from grade to grade was always dispositive. *Id.* at 203 n.25. However, in the case before it, the Court found "[the child]'s academic progress, when considered with the special services and professional consideration accorded by the . . . school administrators, to be dispositive." *Id.*

California Special Education Hearing Office opinions also indicate the importance of grades and educators' assessments when determining whether a child with a severe discrepancy between his ability and achievement is reaping some educational benefit in the general classroom. The hearing officer in *Student v. Sunnyvale Elementary School District* examined as evidence passing or average grades earned without the benefit of special education and gave credence to the opinion the resource specialist and school psychologist provided that any weakness that the child exhibited could be corrected within the regular education program. *Student v. Sunnyvale Elementary Sch. Dist.* (1998) SN 00-00092. Similarly, in *Student v. Long Beach Unified School District*, the hearing officer considered the testimony of teachers and looked at the student's ability to continue maintaining grades sufficient to remain enrolled in an accelerated program as indicative of his ability to benefit from education in the regular classroom. *Student v. Long Beach Unified Sch. Dist.* (1999) SN 00-00721.

**[6]** Application of this benefit standard to the facts presented in this case indicates that Anna does not qualify for special education due to a "specific learning disability" because any existing severe discrepancy between ability and achievement appears correctable in the regular classroom. As the hearing officer noted, "[i]t [is] virtually undisputed in this case that Anna has been progressing in the general curriculum

along with her peers." She received nearly uniformly average or above average grades. At the hearing, Michelle Dennis, Anna's fourth grade teacher, testified that Anna was a highly proficient student. According to the hearing officer, Dennis "was adamant that she would not have considered referring Anna for special education because she was working at or above grade level." Sidney Sickels, Anna's teacher for approximately a month immediately preceding her withdrawal from the school district, testified that Anna was capable of producing work at grade level and that he did not believe that Anna needed to be referred to special education. Dennis Rota, Anna's fifth grade science teacher, agreed. Dr. Beverly Barrett, director of pupil personnel services for the school district, testified that the IEP team did not feel that Anna's conditions had a significant impact on her performance necessitating special education, as she was not performing below grade level. According to this evidence, it appears that the hearing officer was justified in concluding that Anna is receiving the requisite benefit from her education such that the school district is in compliance with the law.

The school district acknowledges in its brief that "there will always be some private school that can provide—perhaps at great expense—an education that is better than the education that can be provided by some other less expensive private school, or perhaps the public school." School districts must function within budgetary constraints that are often quite burdensome. In essence, the Hoods assert that the law guarantees a learning-disabled child of superior ability enough individualized attention and services—likely financed by the school's special education budget—to elicit optimum performance from the child, when clearly no such requirement exists for children without disabilities, gifted or not. As the school district points out, "[a]rguably, all children would perform better with more services." The Supreme Court has directed that "we are not free 'to substitute [our] own notions of sound educational policy for those of the school authorities which

[we] review.' " *Amanda J.*, 267 F.3d at 887 (quoting *Rowley*, 458 U.S. at 206).

[7] The school district asserts that the Section 504 accommodations plan was the appropriate way to meet Anna's needs. At the time when the Hoods withdrew Anna from the school district, the record indicates that Anna had only been in the general classroom with her Section 504 modification plan for the latter portion of the fourth grade and the beginning portion of the fifth grade. Thus, it is difficult to judge its success at meeting Anna's unique needs.[8] The Section 504 plan was directly tailored to address Anna's weaknesses. In her testimony before the hearing officer, Michelle Dennis, Anna's fourth grade teacher, acknowledged that Anna sometimes required additional guidance or extra time to complete tasks. Similarly Sidney Sickels, Anna's fifth grade teacher, and Dennis Rota, Anna's fifth grade science teacher, noted that Anna had problems with missing assignments, completing work in a timely fashion, and organizing tasks. The hearing officer had sufficient reason to conclude that the accommodations that the school district offered Anna via her Section 504 plan, particularly the provisions for daily teacher checks for homework assignments, one-step directions, and use of a graphic organizer, would assist with Anna's difficulties and allow her to excel in the regular classroom. It was certainly not clear error for the district court to accept the hearing officer's judgment.

---

[8]The record does not support appellants' assertion that Anna experienced "accommodations through a '504 Plan' " for "years." The record indicates the creation of a Section 504 plan in February 2001, and Frampton's May 15, 2001 letter to the school district indicates her understanding that "[Anna] ha[d] *recently* been offered a 504 plan" (emphasis added). This would indicate that the Hoods withdrew Anna from her elementary school, where she was exhibiting grade-level appropriate performance, after approximately one year of schooling with modifications specifically designed to meet her needs and about two months after the plan had been modified at appellants' request.

## II.  "Other Health Impairments"

[8] In addition, we conclude that the district did not clearly err in determining that Anna was not legally entitled to special education based on an "other health impairment," in the form of a seizure disorder or attention deficit disorder. Section 1401(3)(A) of IDEA defines "child with a disability" to include a student with "other health impairments" necessitating special education services. Section 3030(f) explains that a pupil experiences such an impairment when she has "limited strength, vitality or alertness, due to chronic or acute health problems, including but not limited to . . . epilepsy . . . ." Cal. Code Regs. tit. 5, § 3030(f). California Education Code § 56339 (2001) elaborates that an attention deficit disorder can also constitute a chronic or acute health problem for the purposes of Section 3030(f)

According to Cal. Educ. Code § 56339, in relevant part:

(a) A pupil whose educational performance is adversely affected by a suspected or diagnosed attention deficit disorder or attention deficit hyperactivity disorder and demonstrates a need for special education and related services by meeting eligibility criteria specified in subdivision (f) . . . of Section 3030 of Title 5 of the California Code of Regulations . . . for the federal Individuals with Disabilities Education Act (20 U.S.C. Sec. 1400 and following) categor[y] of "other health impairments" . . . is entitled to special education and related services.

(b) If a pupil with an attention deficit disorder or attention deficit hyperactivity disorder is not found to be eligible for special education and related services pursuant to subdivision (a), the pupil's instructional program shall be provided in the regular education program.

Additionally, as with all eligibility categories, the child's "other health impairment" must require instruction, services, or both, which cannot be provided with modification of the regular school program per California Education Code § 56026(b). The hearing officer found the evidence that Anna had a seizure disorder and attention deficit disorder to be inconclusive, and ultimately he concluded that "Anna did not require special education to meet her educational needs[,]" which "could be met with appropriate accommodations in the regular education environment." On appeal of the hearing officer's decision, the district court summarily accepted the hearing officer's findings and stated that, because "the evidence was inconclusive[,] . . . Anna did not meet the eligibility criteria specified in § 3030(f)."

While the appendices do not appear to contain copies of diagnoses for seizure or attention deficit disorders, other evidence indicates that Anna's strength, vitality, or alertness had a physiological explanation.[9] However, neither the hearing officer's decision nor the district court's holding was controlled by the decision that Anna did not suffer from an "other health impairment." Rather, the hearing officer rested his decision that the school district did not need to provide special education on the conclusion that "[Anna's] needs could be met with appropriate accommodations in the regular education environment." Likewise, the district court seemed to base its decision on the conclusion that any "other health impairment" that Anna did suffer from did not adversely affect her performance to the extent that she required education outside of the general classroom. In doing so, the district court remarked that the hearing officer's findings on the issue were "carefully detailed [and] supported by the record evidence and the testimony of hearing witnesses." Similarly, we need not determine whether Anna has an "other health impairment" in the form of a seizure disorder or attention deficit disorder, as,

---

[9]In the case of attention deficit disorder, Cal. Educ. Code § 56339 indicates that either a suspected or diagnosed disorder would suffice.

even assuming this to be true, we conclude that the law would not entitle Anna to benefits because it was reasonable for the hearing officer to conclude that any impairment can be accommodated in the general classroom. The school district determined that a Section 504 plan would be sufficient to serve Anna's special needs. To attempt to accommodate Anna, in spite of her medical conditions, in the general classroom is consistent with the concept of mainstreaming, an objective that the school district is legally bound to pursue. *See* 20 U.S.C. § 1412(a)(5).[10] Deference to the hearing officer and the policy determination of the school district itself is appropriate, and the district court did not clearly err in upholding the hearing officer's decision that Anna did not qualify for special education due to an "other health impairment."

## CONCLUSION

For the reasons set forth above, the judgment of the court below is AFFIRMED.

---

[10]The Winston School is a non-public college preparatory school for learning-disabled students. Because we deny reimbursement of the school's tuition, we need not decide whether placement in such a school would constitute an education that comports with the 20 U.S.C. § 1412(a)(5), which requires that, "[t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."