**CARRIE I., on behalf of her son, GREG I., Plaintiff,**

v.

**DEPARTMENT OF EDUCATION, State of HAWAII, Defendant.**

**Civil No. 11–00464 JMS–RLP.**

United States District Court, D. Hawai'i.

May 31, 2012.

Stanley E. Levin, Levin Education Access Project, Susan K. Dorsey, Davis Levin Livingston Grande, Honolulu, HI, for Plaintiff.

James E. Raymond, Honolulu, HI, for Defendant.

## ORDER REVERSING JULY 2011 DECISION OF ADMINISTRATIVE HEARINGS OFFICER

J. MICHAEL SEABRIGHT, District Judge.

## I. INTRODUCTION

In this action brought under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i)(2), Plaintiff Carrie I., on behalf of her son, Greg I. (collectively, "Carrie I." or "Plaintiff") challenges a July 5, 2011 Administrative Hearings Officer's Findings of Fact and Conclusions of Law (the "July 2011 Decision"). The July 2011 Decision upheld the Defendant State of Hawaii, Department of Education's ("DOE") July 19, 2010 Individualized Education Program (the "July 19, 2010 IEP") offering Greg I. a Free Appropriate Public Education ("FAPE") with a public placement located at Aiea High School ("Aiea High") as the least restric-

tive environment ("LRE") for Greg I.'s 2010–2011 school year ("SY"). Under the July 19, 2010 IEP, Greg I. would move from a private placement at Loveland Academy ("Loveland")—where he has attended at DOE expense since July 1999—to a public placement at Aiea High.[1]

Based on the following, the court finds that the DOE committed procedural violations of the IDEA in formulating the July 19, 2010 IEP, and that those violations were not harmless. See, e.g., L.M. v. Capistrano Unified Sch. Dist., 556 F.3d 900, 909 (9th Cir.2009) (reiterating that a procedural violation of the IDEA must result in the "loss of [an] educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process" to be actionable). Thus, Greg I. was denied a FAPE for his 2010–2011 SY. The July 2011 Decision is REVERSED.

## II. BACKGROUND

### A. Greg I. Requires Services Under the IDEA

No one disputes that Greg I. (who was nearly eighteen years old when the July 19, 2010 IEP was developed, and will be twenty in a few months) is disabled for purposes of qualifying for services under the IDEA. Among other conditions, he is diagnosed with autism and Landau–Kleffner Syndrome ("LKS").[2] AR Ex. 26, July

---

1. Because Plaintiff has challenged the July 2011 Decision, Greg I. remains at Loveland as his "current educational placement" under the IDEA'S "stay put" provision, 20 U.S.C. § 1415(j).

2. According to the National Institute of Neurological Disorders and Strokes of Health, National Institutes of Health:

> Landau–Kleffner syndrome (LKS) is a rare, childhood neurological disorder characterized by the sudden or gradual development of aphasia (the inability to understand or express language) and an abnormal electroencephalogram (EEG). LKS affects the parts of the brain that control comprehen-

sion and speech. The disorder usually occurs in children between the ages of 5 and 7 years. Typically, children with LKS develop normally but then lose their language skills for no apparent reason. While many of the affected individuals have seizures, some do not. The disorder is difficult to diagnose and may be misdiagnosed as autism, pervasive developmental disorder, hearing impairment, learning disability, auditory/verbal processing disorder, attention deficit disorder, mental retardation, childhood schizophrenia, or emotional/behavioral problems.

2011 Decl. ¶ 1.[3] He is described as "low functioning," with an IQ estimated by a teacher at between fifty and sixty (with a report from 2007 indicating a "full scale" IQ of forty-six). *Id.* ¶ 29; Pet. 22. He has a history of seizures and speech difficulties. AR Ex. 26, July 2011 Decl. ¶¶ 5, 14; Tr. 105. He is small in stature, standing five feet tall and weighing about one hundred pounds, and appears to be much younger than his chronological age. AR Ex. 26, July 2011 Decl. ¶ 4.

Although described as a "happy and joyous person," *id.* ¶ 4, Greg I. also has many behavioral issues. He has difficulty communicating. *Id.* ¶ 8. He has a history of "darting," that is, quickly running away from others. *Id.* ¶¶ 8, 19; Tr. 107–08. He is "highly distractible and impulsive." AR 26, July 2011 Decl. ¶ 19. He "invad[es] the personal space of others in order to seek attention" and, in inappropriate situations, "lifts people's clothes," takes off his shoes, "puts his hand inside other people's shirts," and "touch[es] other people's hats or cell phones." *Id.*; Tr. 29, 32, 37, 39, 107–08; Resp. GI026; Pet. 28.

In short, by all accounts, Greg I. has a disability and is entitled to, and needs, a full range of services under the IDEA.

## B. History of Greg I.'s Placement at Loveland

Greg I. has attended Loveland at DOE expense since July 1999, when he was six years old. Loveland is a private "mental health treatment facility, with a school component." AR 26, July 2011 Decl. ¶ 3.

It has a small, secured, fenced-in campus, and is composed entirely of special education students or patients. *Id.* ¶¶ 3, 7; Tr. 11–12. At Loveland, in addition to a one-on-one skills trainer, Greg I. has access to professionals in mental health, special education, speech, and occupational therapy. AR 26, July 2011 Decl. ¶¶ 2–3; Tr. 11–12, 81.

Greg I.'s attendance at Loveland over the past thirteen years has resulted from a combination of (1) DOE placements at Loveland; (2) prior successfully-adjudicated challenges (from his perspective) to DOE IEPs offering a FAPE with a public placement at various locations, allowing him to remain at Loveland; (3) settlement agreements with the DOE after Greg I. challenged DOE offers of FAPE at public placements; and (4) most recently, under the IDEA'S stay put provision as he challenges the July 2011 Decision.

Many of the details of this long history of placements are not germane towards analyzing the *current* challenge to the July 2011 Decision upholding the July 19, 2010 IEP's offer of a FAPE at Aiea High. The basic history, however, is important to put the July 19, 2010 IEP's offer of FAPE in proper context—the DOE proposed a program at a public placement with obvious differences from Greg I.'s (then) eleven year long stay at Loveland. As such, a major aspect of the July 19, 2010 IEP was—or should have been, according to Plaintiff—dedicated to addressing Greg I.'s unique needs resulting from that prior history, as he would be making a substan-

*NINDS Landau–Kleffner Syndrome Information Page,* http://www.ninds.nih.gov/disorders/landaukleffnersyndrome/landaukleffnersyndrome.htm (last visited May 22, 2012).

**3.** The record consists of several sets of documents. This Order uses the following abbreviations: (1) "AR" refers to the Administrative Record on Appeal (numbered from 1 to 155, with Exhibits 1 to 26); (2) "Pet." refers to Petitioner's Exhibits (numbered from 1 to 204, with Exhibits 1 to 21), where "Petitioner" is Carrie I.; (3) "Resp." refers to Respondent's Exhibits (labeled GI001 to GI133, with Exhibits 1 to 9), where "Respondent" is the DOE; (4) "Tr." refers to transcripts of the May 16–17, 2011 hearing; and (5) "Doc. No." refers to the document number in this court's electronic case file.

tial change from his long-standing private placement at Loveland to a very different public placement at Aiea High. He would also be preparing for a transition from an educational setting to the rest of his life and, under applicable IDEA regulations, the IEP should also have focused on those transitional goals.

The recent placement history is also relevant because it indicates Greg I.'s behavioral issues are not new. The same behavioral issues were part of prior proposed IEPs offering a placement located at Aiea High for Greg I.'s 2008–2009 SY and 2009–2010 SY. Pet. 54–55, 79. And, in fact, important aspects of the July 19, 2010 IEP were taken nearly verbatim from the proposed IEPs for those prior years. *See, e.g.,* Tr. 226–27, 234–35 (comparing the LRE explanations in Pet. 71 with Resp. GI042 and observing that they are nearly verbatim). The placement history also indicates that the DOE offered Greg I. a placement in 2006 at "Hauoli Na Keiki,"[4] in combination with services at Aiea High, as well as placements at Aiea High since 2008 (similar to the placement offered in the July 19, 2010 IEP). Pet. Exs. 3–5. And these details may have some bearing in analyzing whether the July 19, 2010 IEP fully and properly considered Aiea High as the proper location for Greg I.'s educational program and placement for his 2010–2011 SY.

### C. The Offer of a FAPE in the July 19, 2010 IEP

As it had since Greg I.'s 2008–2009 school year, the DOE offered Greg I. a FAPE with a public placement located at Aiea High for his 2010–2011 SY, with the details set forth in the July 19, 2010 IEP. Specifically, the July 19, 2010 IEP offered special education services of 1,314 minutes per week (73 minutes, 18 times per week). AR 26, July 2011 Decl. ¶ 15. It offered 120 minutes per week of speech language; 150 minutes per week of occupational therapy; and additional special education after school for 870 minutes per week. *Id.* Also offered were supplemental aids and services, assistive technology, community based instruction, counseling, behavioral support services, and an extended school year. *Id.*

Aiea High has an enrollment of over one thousand students. Tr. 31, 252–53. Physically, it is much larger than Loveland. Tr. 213,253. It is an open campus, bordered by two "main roads" that "can get very busy." Tr. 219. Although its special education classroom is self-contained, Greg I.'s community based instruction would take place with regular education peers in the regular campus environment. Tr. 218; Pet. 44.

The July 19, 2010 IEP was developed at two IEP meetings held on June 30, 2010 and July 19, 2010. AR 26, July 2011 Decl. ¶ 9. At the June 30, 2010 IEP meeting, Greg I.'s current special education teacher from Loveland shared Loveland's June 2010 academic program update and a June 2010 transdisciplinary team treatment plan. *Id.* ¶ 10. Loveland also had a functional behavioral assessment, a behavioral support plan, and a crisis plan for Greg I.'s seizures, but these assessments and plans were not brought to either IEP meeting. *Id.* ¶ 11.

---

4. "Hauoli Na Keiki School" is described as a "specialized school for children with autism" with services provided by Child and Family Service (a private, nonprofit, human services provider) and funded by the DOE. *See* http://www.childandfamilyservice.org/cfs2.php?idl=52 (last visited May 30, 2012). Its only relevance here is that the DOE has considered other locations besides Aiea High for Greg I.'s placement in the past, thus implying that it could have considered other locations for Greg I.'s placement aside from Aiea High in the July 19, 2010 IEP for his 2010–2011 SY.

The IEP team did not have the benefit of an evaluation of Greg I. The DOE had not evaluated Greg I. for some time, although the record does not establish exactly when a reevaluation was last performed.[5] Under the IDEA'S regulations, a comprehensive reevaluation must occur "at least once every 3 years" unless a parent and the public agency otherwise agree. *See* 34 C.F.R. § 300.303(b)(2). According to Greg I.'s special education teacher, the DOE had not conducted a comprehensive evaluation of Greg I. in the three years preceding the July 19, 2010 IEP. AR Ex. 26, July 2011 Decl. ¶ 11; Tr. 18. The DOE does not specifically contest this assertion, although it points out that the Hearings Officer found and emphasized (without drawing any conclusions) that the July 19, 2010 IEP states that a reevaluation was not due until April 10, 2011. AR Ex. 26, July 2011 Decl. ¶ 11. Assuming the July 19, 2010 IEP was correct that a reevaluation was not actually due until April 10, 2011, an evaluation should have last occurred in April 2008.[6] The proposed IEP dated April 10, 2008, however, indicates that a reevaluation was due on March 23, 2010. *See* Pet. 73. The Hearings Officer's July 2011 Decision does not explain this apparent discrepancy, or indicate why the date changed between the different IEPs.

In any event, it is undisputed that the July 19, 2010 IEP was prepared without a reevaluation (or any other assessments) by the DOE. Tr. 241. Rather, the IEP was based primarily, if not almost exclusively, on initial input from Loveland representatives. Loveland representatives shared their goals and objectives with the IEP team, and prepared detailed "present levels of educational performance" ("PLEPS"), which were used by the team as a base line for the July 19, 2010 IEP. AR Ex. 26, July 2011 Decl. ¶¶ 13, 16, 23; Tr. 25, 196, 202, 214–15. It is undisputed that no DOE representative had observed or evaluated (or even met) Greg I., except for (1) a half-hour observation by the Aiea High special education student services coordinator ("SSC") at Loveland on June 9, 2010; and (2) an hour-long observation by a different DOE special education teacher in June 2009. *Id.* ¶ 14; Tr. 17, 86, 213; *see also* Tr. 241 (SSC acknowledging that no "formal" DOE evaluations were conducted for the June 30, 2010 and July 19, 2010 IEP meetings).

An important aspect of the current challenge is a section of the July 19, 2010 IEP regarding "transition services." This section states that Greg I.'s post high school goals are "to be productive, independent, and get a job of his interest." Pet. 30. The section has a table entitled "Beginning at Age 16 Years, or Younger if Appropriate, A Statement of Needed Transition Services and, if Appropriate, a Statement of Interagency Responsibilities or Any Needed Linkages," reproduced below:

---

5. The IDEA's regulations provide that "[a] public agency must ensure that a reevaluation of each child with a disability is conducted in accordance with §§ 300.304 through 300.311" if warranted, or if a parent or teacher requests an evaluation. 34 C.F.R. § 300.303(a). In turn, sections 300.304 through 300.311 detail the many require-ments for assessments, observations, and documentation needed for these formal reevaluations.

6. Nothing in the record indicates that Carrie I. and the DOE previously otherwise agreed not to perform a reevaluation of Greg I.

**14. BEGINNING AT AGE 16 YEARS, OR YOUNGER IF APPROPRIATE, A STATE-MENT OR NEEDED TRANSITION SERVICES AND, IF APPROPRIATE, A STATE-MENT OF INTERAGENCY RESPONSIBILITIES OR ANY NEEDED LINKAGES.**

| Post School Outcome | Transition Services Needed | Agency Responsible/ Linkages |
|---|---|---|
| Employment—To receive Vocational Rehabilitation Services | Teacher will assist student and family in the DVR process | |
| Community Experiences— See IEP Plep goals and objectives | Teacher will provide instruction and opportunities to practice IEP goals and objectives | |
| Instruction—see IEP Plep goals and objectives | Teacher will provide instruction and opportunities to practice IEP goals and objectives | Parent has a ISP through Develpmental [sic] Disablity [sic] |
| Independent Living Skills— see IEP Plep goals and objectives | Teacher will provide instruction and opportunities to practice IEP goals and objectives | |
| Related Services—to access related services | Teacher will assist student and family in the DVR process and also coordinate with DD | |

*Id.*

In this transition-services context, "DVR" refers to the State of Hawaii Department of Human Services Division of Vocational Rehabilitation, Tr. 199, the State agency that assists disabled individuals in vocational rehabilitation *i.e.*, it is the "agency" responsible for "needed linkages." Tr. 229. Likewise, "DD" refers to an agency with the Hawaii Department of Health dealing with developmental disabilities. Tr. 200. It is undisputed that no DVR representative was invited to either the June 30, 2010 or July 19, 2010 IEP meeting, and that it was the DOE's responsibility, if appropriate, to invite a DVR representative to be a member of the IEP team. Tr. 229, 231; *see* 34 C.F.R. § 300.321(b)(3).

Another part of the July 19, 2010 IEP at issue is a discussion regarding Greg I.'s LRE. Box 23 of the IEP is labeled: "Explain to the extent, if any, that the students will not participate with students without disabilities in the general education class, extracurricular activities and

other non-academic activities." The July 19, 2010 IEP explained:

Least Restrictive Environment Greg— will not participate with his non-disabled peers for the entire school day except during community based instruction where he will participate with his regular education peers. . . . Greg will receive his specialized instruction in a special education classroom, on a public school campus, in a small group setting with students with varying levels of competencies, some of which are higher functioning and have more language abilities than Greg in order to facilitate social interactions. . . .

Pet. 44. Given that LRE description, the DOE proposed in a July 23, 2010 written notice to place Greg I. at his home school, Aiea High. The DOE explained, in part, that:

. . . . The Department of Education can provide and implement an individualized education program that addresses [Greg's] unique and individualized needs outlined in his Present Levels of Academic Achievement and Functional

Performance. The Department of Education public school is Greg's least restrictive environment. The DOE can provide a free appropriate public education that meets the needs of Greg and that can address parent's concerns. Greg will have access to peers that live in his community. The DOE public school can offer an intensive and comparable service to Loveland and a lesser restrictive environment.

Pet. 4. This was the identical, word-for-word, offer of an LRE that was made a year earlier. *See* Pet. 12. The SSC from Aiea High believed it was appropriate for Greg to have interaction with "higher functioning students," *i.e.*, "peers his same age and not just people with disabilities." Tr. 208–09. He testified at the administrative hearing that "eventually [Greg's] going to be … outside of the school setting and he's going to have to be able to interact with peers … [who are] not disabled … [s]o he would benefit if he would be around many different types of people in that setting." Tr. 236.

Aside from the program offered in the July 19, 2010 IEP, Aiea High's Principal testified that "all of the services that Greg was receiving at Loveland could be provided at Aiea High School." Tr. 250. "[W]e strongly felt that we could do everything that the IEP was calling for and that Loveland was already doing." Tr. 250. Likewise, the SSC testified that the Principal said Aiea High "could offer all the services that we agreed upon at the [IEP] meeting." Tr. 225. And so, the July 19, 2010 IEP and offer of FAPE being challenged entails a placement located at Aiea High as the LRE.

**D. The July 2011 Decision and the Current Challenge**

Carrie I. disagreed with the July 19, 2010 IEP and its offer of Aiea High as the LRE for that placement. On August 10, 2010, she filed a request for an administrative due process hearing, alleging, among other claims, that (1) the DOE predetermined Greg I.'s educational placement without participation from his parents, and without considering potential harmful effects of his LRE; (2) the DOE failed to conduct a comprehensive evaluation of Greg. I. before offering a significant change in placement; and (3) the DOE failed to have a transition plan in place that includes appropriate, measurable post-secondary goals based upon age-appropriate transition assessments relating to training education, employment, and independent living skills. AR Ex. 26, July 2011 Decl. at 2, 9.

The Administrative Hearings Officer held an evidentiary hearing on May 16 and May 17, 2011, and issued his decision on July 5, 2011. The July 2011 Decision upheld the July 19, 2010 IEP, finding that Carrie I. had "not shown that the program and placement offered by the DOE through the July 19, 2010 IEP did not provide [Greg. I.] with an offer of FAPE to address his individual needs." *Id.* at 19.

Specifically, the Hearings Officer conclude[d] that

[Carrie I. had] not shown that:
—the goals and objectives or the transition services offered in the July 19, 2010 IEP were inappropriate;
—there were no people knowledgeable about [Greg I.], the evaluation data, and the placement options at the June 30, and July 19, 2010 IEP meetings;
—the DOE unilaterally changed [Greg I.'s] placement, or that the DOE had predetermined placement; and
—the placement offered by the DOE in a [fully self-contained] classroom at the home school was an inappropriate placement.

*Id.*

On July 28, 2011, Carrie I. filed this action seeking review of the July 2011

Decision. Carrie I. filed her Opening Brief on February 10, 2012. Doc. No. 19. The DOE filed its Answering Brief on March 23, 2012, and Carrie I. filed her Reply on April 4, 2012. Doc. Nos. 22, 23. The matter was heard on April 16, 2012. Supplemental briefs were filed on April 23, 2012. Doc. Nos. 25, 26.

## III. STANDARD OF REVIEW

The IDEA provides that "[a]ny party aggrieved by the findings and decision" of the hearings officer "shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A).

The IDEA requires the following of the court:

> In any action brought under this paragraph, the court—
> (i) shall receive the records of the administrative proceedings;
> (ii) shall hear additional evidence at the request of a party; and
> (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(i)(2)(C). *In Board of Education of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the Supreme Court explained the court's role in reviewing an administrative decision in an IDEA case:

> [T]he provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at nought. The fact that § [1415(i)] requires that the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement that due weight shall be given to these proceedings. And we find nothing in the Act to suggest that merely because Congress was rather sketchy in establishing substantive requirements, as opposed to procedural requirements for the preparation of an IEP, it intended that reviewing courts should have a free hand to impose substantive standards of review which cannot be derived from the Act itself. In short, the statutory authorization to grant "such relief as the court determines is appropriate" cannot be read without reference to the obligations, largely procedural in nature, which are imposed upon recipient States by Congress.

*See also City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 171, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997) (citing *Rowley* for the proposition that the IDEA "contemplates deferential review of state administrative action"). The "fact-intensive nature" of IDEA proceedings "coupled with considerations of judicial economy render a more deferential approach appropriate." *Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1104 n. 4 (9th Cir.2007).

The Ninth Circuit has explained that despite this deferential approach, the court has discretion in reviewing the hearings officer's decision:

> The proposition that the courts must give "due weight" raises the question of how much weight is "due." **We held in** *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir.1987), that "[h]ow *much* deference to give state educational agencies ... is a matter for the discretion of the courts." Following

a First Circuit decision, we held in *Gregory K.* that the courts are to consider the findings "carefully and endeavor to respond to the hearing officer's resolution of each material issue," but the court "is free to accept or reject the findings in part or in whole." *Id.*

When exercising its discretion to determine what weight to give the hearing officer's findings, one criterion we have found useful is to examine the thoroughness of those findings. The amount of deference accorded the hearing officer's findings increases where they are "thorough and careful."

*Capistrano Unified Sch. Dist. v. Wartenberg,* 59 F.3d 884, 891 (9th Cir.1995) (citations omitted; alterations in original); *see also Ms. S. ex rel. G. v. Vashon Island Sch. Dist.,* 337 F.3d 1115, 1126 (9th Cir. 2003) ("The 'due weight' to be given is within the discretion of the appellate court." (*superseded on other grounds* by 20 U.S.C. § 1414(d)(1)(B))).

■ Where a hearings officer's decision contains some findings that are "thorough and careful," and others that are not, the court can give deference to the thorough and careful findings and yet review other findings independently. *See R.B., ex rel. F.B. v. Napa Valley Unified School Dist.,* 496 F.3d 932, 943 (9th Cir.2007) ("[W]e accord particular deference to the [hearings officer's] 'thorough and careful' findings . . . although we independently review the testimony in the record that [he] failed to consider.").

The burden in this proceeding is on Carrie I., as she is the party challenging the administrative ruling. *Schaffer ex rel. Schaffer v. Weast,* 546 U.S. 49, 62, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005); *Seattle Sch. Dist., No. 1 v. B.S.,* 82 F.3d 1493, 1498 (9th Cir.1996) ("As the party challenging the administrative ruling, the School District . . . had the burden of proof in district court.").

## IV. *DISCUSSION*

The court sets forth the applicable legal framework under the IDEA, and then addresses whether the Hearings Officer erred in determining that the July 19, 2010 IEP did not deny Greg I. a FAPE.

### A. Legal Framework

■ A basic three-step analysis applies in determining whether a violation of the IDEA denies a qualified disabled student a FAPE.

First, the court asks whether the school district violated the IDEA, either "procedurally" or "substantively." *Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034. A school district may violate the IDEA'S statutory or regulatory procedures in creating or implementing (or failing to create or implement) an IEP. *Id.* Or a school district may violate the IDEA substantively by offering an IEP that is not reasonably calculated to enable the child to receive educational benefit. *Id.* The school district must provide the student with a FAPE that is "appropriately designed and implemented so as to convey" to the student a "meaningful" benefit. *J.W. v. Fresno Unified Sch. Dist.,* 626 F.3d 431, 433 (9th Cir.2010) (quoting *Adams v. Oregon,* 195 F.3d 1141, 1149 (9th Cir.1999)).

■ Second, if the court finds a violation of the IDEA'S procedures, the court then addresses whether that violation denied that student a FAPE—for not all procedural violations are actionable. *See, e.g., Capistrano Unified Sch. Dist.,* 556 F.3d at 909; 20 U.S.C. § 1415(f)(3)(E)(ii).[7]

7. Section 1415(f)(3)(E)(ii) provides:
   In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies—

The procedural violation must result in the "loss of [an] educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process." *Capistrano Unified Sch. Dist.*, 556 F.3d at 909 (quoting *W.G. v. Bd. of Trs. of Target Range Sch. Dist.*, 960 F.2d 1479, 1484 (9th Cir.1992)). That is, "where a procedural violation does not result in a lost educational opportunity for the student, the violation is 'harmless error' because it does not deny the student a FAPE." *Napa Valley Unified Sch. Dist.*, 496 F.3d at 938 n. 4 (citation omitted).

■ The third stage is the remedy—and this stage itself includes several steps. If an IDEA violation results in denial of a FAPE, a district court has discretion to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). Such relief could include reimbursement for a private placement. *See* 20 U.S.C. § 1412(a)(10)(C)(ii); *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 370, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). The parent or guardian, however, must also establish that the particular private placement is itself "appropriate." *See, e.g.,*

> (I) impeded the child's right to a free appropriate public education;
> (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or
> (III) caused a deprivation of educational benefits.

8. She specifically cites the following regulations or sets of regulations: (1) 34 C.F.R. § 300.303(b)(2)—requiring a three-year re-evaluation; (2) 34 C.F.R. § 300.320(a)(2)—regarding an IEP's annual goals; (3) 34 C.F.R. §§ 300.320(b) and 300.321(b)(3)—regarding "transition services"; (4) 34 C.F.R. § 300.324—requiring consideration of parent concerns in developing an IEP; (5) 34 C.F.R. § 300.501—regarding parental participation in LRE placement decisions; (6) 34 C.F.R. § 300.116(a)(1)—regarding who must be in-

*Ashland Sch. Dist. v. Parents of Student E.H.*, 587 F.3d 1175, 1183 (9th Cir.2009).

## B. Application—Challenges to the July 19, 2010 IEP

Carrie I. invokes, in shotgun-like fashion, many IDEA regulations (or corresponding statutory sections of the IDEA or of Hawaii's administrative regulations) that she claims the DOE violated.[8] Some challenges have merit and some don't. All the challenges, however, center around three general categories of alleged procedural violations: (1) a lack of a necessary *evaluation*, (2) the *location* (Aiea High) of the proposed LRE, and (3) *transition* considerations. The court addresses each category in turn.

### 1. Claims Relating to Lack of Evaluations

#### a. A "significant change in placement" without an evaluation does not violate the IDEA

■ Carrie I. contends that the July 19, 2010 IEP denied a FAPE because it offered a "significant change in placement" from Loveland to Aiea High without a comprehensive re-evaluation, as required under 34 C.F.R. § 104.35.[9] The Hearings

volved in placement decisions; (7) 34 C.F.R. § 300.116(d)—requiring consideration of harmful effects in selecting LRE; and (8) 34 C.F.R. § 104.35—requiring (under the Rehabilitation Act, 29 U.S.C. § 794) a comprehensive evaluation before making a "significant change in placement."

9. Section 104.35(a) provides:

> A recipient that operates a public elementary or secondary education program or activity **shall conduct an evaluation** in accordance with the requirements of paragraph (b) of this section of any person who, because of handicap, needs or is believed to need special education or related services before taking any action with respect to the initial placement of the person in regular or special education **and any subsequent significant change in placement.**
> (Emphasis added).

Officer indeed found (as the DOE admitted, Tr. 212) that the move from Loveland to Aiea High would be a "significant change in placement." AR Ex. 26, July 2011 Decl. at 18. But § 104.35 is a regulation under § 504 of the Rehabilitation Act, 29 U.S.C. § 794—not an IDEA regulation—and a violation of § 104.35 is not actionable under the IDEA. The Hearings Officer thus found no merit to this claim, and the court agrees that it is not actionable here.

Although § 504 contains an implied private right of action in certain circumstances for violations of its regulations, *see Mark H. v. Lemahieu,* 513 F.3d 922, 924 (9th Cir.2008), the "contours of [a § 504] cause of action ... remain murky." *C.O. v. Portland Public Schs.,* 679 F.3d 1162, 1169–70 (9th Cir.2012). Indeed, Carrie I.'s Complaint (although it mentions § 504), does not make an independent claim for a violation of the Rehabilitation Act. It only seeks review under 20 U.S.C. § 1415(i)(2)(A), asking for injunctive relief (and attorneys' fees and costs). Even if she is seeking an injunction for a violation of the Rehabilitation Act, such relief is subsumed within the question whether the IEP *under the IDEA* was proper. *See, e.g., Laddie C. v. Dep't of Educ.,* 2009 WL 855966, at *5 (D.Haw. Mar. 27, 2009) ("[T]he DOE was not required to meet section 504 evaluation requirements separate from development of a valid IEP under the IDEA.").

Furthermore, a successful § 504 discrimination claim for damages requires a showing of intent or deliberate indifference. *Mark H.,* 513 F.3d at 938 ("[A] public entity can be liable for damages under § 504 if it intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons."). Thus, even if the court construes the Complaint as pleading a § 504 claim, Carrie I. has not addressed—and thus has not met—this burden to demonstrate "deliberate indifference" under § 504.

*b. A lack of a three-year evaluation*

Carrie I. also contends the DOE violated 34 C.F.R. § 300.303(b)(2) [10] by failing to perform a required triennial reevaluation. As explained earlier, the evidence in this regard is mixed. Greg I.'s special education teacher at Loveland testified that the DOE had not conducted an evaluation in the three years prior to the July 19, 2010 IEP, but the IEP stated that a reevaluation was not due until April 10, 2011. The Hearings Officer did not resolve this factual question, perhaps because he did not need to do so. The issue was not properly before him-Carrie I.'s Request for Impartial Hearing did not raise this specific issue. *See* AR 3–4 (raising whether an evaluation was needed before making a significant change in placement, but not raising a failure to perform a triennial reevaluation). Accordingly, the court here

---

10. Section 300.303 regarding "reevaluations" provides:

(a) General. A public agency must ensure that a reevaluation of each child with a disability is conducted in accordance with §§ 300.304 through 300.311—
(1) If the public agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation; or

(2) If the child's parent or teacher requests a reevaluation.
(b) Limitation. A reevaluation conducted under paragraph (a) of this section—
(1) May occur not more than once a year, unless the parent and the public agency agree otherwise; and
*(2) Must occur at least once every 3 years, unless the parent and the public agency agree that a reevaluation is unnecessary.*
(Emphasis added).

cannot reach whether § 300.303(b)(2) was violated. *See* 34 C.F.R. § 300.511(d) ("The party requesting the due process hearing may not raise issues at the due process hearing that were not raised in the due process complaint filed under § 300.508(b), unless the other party agrees otherwise.").

### 2. *The LRE and its Location at Aiea High*

Carrie I. next contends that the July 19, 2010 IEP denied FAPE because it offered Greg I. a "placement" at Aiea High as the LRE without the IEP team specifically considering that placement, without considering the possible "harmful effects" of his move to that LRE, and without a formal behavioral intervention plan. These decisions were made, she contends, without considering her views as a parent in violation of IDEA regulations. In particular, Carrie I. invokes 34 C.F.R. § 300.116,[11] § 300.324(a)(2)(i),[12] and § 300.501.[13]

Carrie I. acknowledges that the IEP team (which included her as a member) met twice to develop Greg I.'s IEP, and the record supports the Hearings Officer's

findings that the IEP team discussed most aspects of the IEP and that it was understood that Aiea High would be its setting. But she takes issue with the DOE's offer of Aiea High without having considered the potential harmful effects of that location on Greg I. and without obtaining parental input. Indeed, she contends there was no "placement" meeting at all, much less any discussion of possible harm at the specific location chosen. She thus believes Greg I.'s "placement" was improperly "predetermined." *See, e.g., K.D. v. Dep't of Educ.,* 665 F.3d 1110, 1123 (9th Cir. 2011) ("A school district violates the IDEA if it predetermines placement for a student before the IEP is developed or steers the IEP to the predetermined placement . . . . because the Act requires that the placement be based on the IEP, and not vice versa.") (citations omitted).

There are thus two aspects to this claim regarding the offer of FAPE at Aiea High: First, Carrie I. finds fault with selection of the *location* (but not necessarily with a public educational placement per se). Second, she claims the IEP team never considered harmful effects of that specific lo-

---

**11.** Section 300.116 provides in pertinent part:

In determining the educational placement of a child with a disability, including a preschool child with a disability, each public agency must ensure that—
(a) The placement decision—
(1) Is made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options; and
(2) Is made in conformity with the LRE provisions of this subpart, including §§ 300.114 through 300.118;
. . . .
(d) In selecting the LRE, consideration is given to any potential harmful effect on the child or on the quality of services that he or she needs[.]

**12.** Section 300.324(a)(2) provides that "[t]he IEP Team must—

(i) In the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports and other strategies, to address that behavior[.]

**13.** Section 300.501 provides in pertinent part:

. .
(b) Parent participation in meetings.
(1) The parents of a child with a disability must be afforded an opportunity to participate in meetings with respect to—
(i) The identification, evaluation, and educational placement of the child; and
(ii) The provision of FAPE to the child.
(c) Parent involvement in placement decisions.
(1) Each public agency must ensure that a parent of each child with a disability is a member of any group that makes decisions on the educational placement of the parent's child.

cation in determining it was the LRE, and did not have a behavioral intervention plan. The court considers each aspect of this claim separately.

### a. An IEP meeting was not required specifically to determine the location

Carrie I. argues that Aiea High was not discussed during the June 30, and July 19, 2010 IEP meetings as the LRE. Rather, she contends, it was not until four days *after* the July 19, 2010 IEP that the DOE specifically proposed a placement at Aiea High (Greg I.'s home school, *i.e.,* the school in the district where he lives) as the LRE. Pet. 4 (notice dated July 23, 2010). She indicates that, although the parties may have understood that the July 19, 2010 IEP would be implemented at Aiea High, there was no discussion at the two IEP meetings about the particular characteristics of the location.

■ The court finds no merit to this aspect of Carrie I.'s claim—the claim assumes that "location" is synonymous with "placement" and that the specific "location" must be determined by the IEP team at an IEP meeting. But the terms are different; "[l]ocation is one of the components of an educational placement." *Melodee H. v. Dep't of Educ.,* 2008 WL 2051757, at *7 (D.Haw. May 13, 2008). That is, the IDEA'S procedures must be followed in determining or changing an "educational placement," but the location of the services is not synonymous with "educational placement."

In this context, the Ninth Circuit defines "educational placement" as follows:

"[E]ducational placement" means the general educational program of the student. More specifically ... under the IDEA a change in educational placement relates to whether the student is moved from one type of program—*i.e.,* regular class—to another type—*i.e.,* home instruction. A change in the edu-

cational placement can also result when there is a significant change in the student's program even if the student remains in the same setting.

*N.D. v. Haw. Dep't of Educ.,* 600 F.3d 1104, 1116 (9th Cir.2010). In accepting that definition of "educational placement," *N.D.* reviewed "Supreme Court case law, Congress's express intent in the statute, the agency's implementing regulations, and sister circuits' decisions." *Id.*

■ "[T]hough the IDEA requires the 'educational placement' decision to be made by a group of people including the parents, 'educational placement' within the meaning of the IDEA does not refer to a specific location or program." *K.L.A. v. Windham Se. Supervisory Union,* 371 Fed.Appx. 151, 153–54 (2d Cir.2010). "The [United States Department of Education's] longstanding position is that placement refers to the provision of special education and related services rather than a specific place, such as a specific classroom or specific school." 71 Fed.Reg. 46540, 46687 (Aug. 14, 2006). Likewise, Hawaii Administrative Rule ("HAR") § 8–60–2 (effective Nov. 23, 2009), defines "placement" as "an educational setting" and "does not mean the specific location or school but the type of placement on the continuum of placement options."

Therefore, even if there was no meeting to discuss Aiea High's particulars, the IDEA does not require such a meeting (much less a meeting that must be held with parental participation) just to resolve the location of an LRE. Rather, if an IEP team considers the location as part of the "placement" for special education and related services, then the IDEA's requirements as to location are satisfied. Here, Aiea High had been the home school making FAPE offerings to Greg I. since at least 2006. Although the DOE had offered some aspects of a program at "Hauoli Na

Keiki School" for the 2006–2007 SY, even that proposed IEP contained a component at Aiea High. Pet. Ex. 3–5. Accordingly, the court finds no specific procedural violation of the IDEA in selecting the location of the LRE. Whether the DOE violated the IDEA in fully considering the "placement" is a different question, which the court turns to next.

b. *There was no discussion of possible "harmful effects" before selecting Aiea High as the LRE, and no behavioral plan*

■ Carrie I. next contends the DOE failed to consider the possible "harmful effects" of Aiea High as the LRE. Even if the IDEA's procedures do not apply specifically to determining a location, the possible harmful effects of that location must still be considered. *See R.B. v. Mastery Charter Sch.*, 762 F.Supp.2d 745, 762–63 (E.D.Pa.2010) ("While 'as a general matter, the location of the services is not conclusive in determining what constitutes the educational placement of the student,' the physical location of services 'cannot be entirely divorced from the inquiry.'") (citation omitted). That is, whether or not a separate meeting is necessary, as noted earlier, the IDEA specifically requires assessing "harmful effects" when selecting the LRE. *See* 34 C.F.R. § 300.116(d) (requiring a public agency, such as the DOE, to ensure that "[i]n selecting the LRE, consideration is given to any potential harmful effect on the child or on the quality of services that he or she needs").

■ The record clearly indicates that this was not done. The July 2011 Decision does not address this issue, other than to state that the post-IEP written notice "reflects that the LRE environment was discussed." AR Ex. 26, July 2011 Decl. at 17. Contrary to that finding, there is in fact no evidence that the IEP team specifically discussed Greg I.'s behavioral problems (e.g., "darting," reaching under shirts, touching cell phones, *see* Pet. 28) before selecting Aiea High as the LRE. And there is no evidence that the IEP discussed any particulars of Aiea High—*e.g.*, its physical size, both in terms of enrollment and geography, and its openness in contrast to Loveland—and how Aiea High would deal with those behaviors.

The July 19, 2010 IEP lacks necessary goals and objectives to deal with those problems. *See* 34 C.F.R. § 300.320(a)(2).[14] Such discussion, if it occurred, did not take place during the two IEP meetings. That is, the educational placement decision as a whole did not consider all the necessary factors. Rather, the IEP meetings understandably focused on whether the DOE (at Aiea High) could provide similar services that Greg I. was receiving at Loveland—with some interaction with non-disabled students—and whether the DOE would be ensuring that "to the maximum extent appropriate" Greg I. would be "educated with children who are non-disabled." 34 C.F.R. § 300.114 (setting forth LRE requirements). That is, there were IEP meetings, but those meetings did not ex-

14. Section 300.320 defines IEP, in part, as follows:

> (a) General. As used in this part, the term individualized education program or IEP means a written statement for each child with a disability that is developed, reviewed, and revised in a meeting in accordance with §§ 300.320 through 300.324, and that must include—
> . . . .

> (2)(i) A statement of measurable annual goals, including academic and functional goals designed to—
> (A) Meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and
> (B) Meet each of the child's other educational needs that result from the child's disability;

amine the harmful effects of an LRE placement at Aiea High.[15]

Indeed, the Aiea High SSC forthrightly testified that officials (teachers or an IEP team) would have met *later* to discuss a transition plan from Loveland to Aiea High to consider how to deal with its particulars (*e.g.*, layout, size, and student population).[16] He thus admitted that the team had not discussed transition issues from Loveland to Aiea High at the IEP meetings before July 19, 2010. Tr. 223–24. The SSC testified in this regard as follows:

Q. [D]id the IEP team consider the potential harm of attending a DOE campus?

A. It was brought up at the end of the meeting that we could convene again to discuss a transition plan to come to Aiea High School so we could ... look at slowly transitioning to Aiea High School.

Tr. 207.

Q .... Your testimony was that the discussion about harm came after the offer was made by [the Aiea High Principal]; is that correct?

A. Yes.

Tr. 222.

Q. At any time prior to the offer of FAPE ... was there a specific discussion about the potential harmful effects of placing Greg at Aiea High School?

A. The discussion was just that we could have a transition meeting in the future[.]

Tr. 223.

Q. [The Principal] made an offer, parents asked what about the harmful effects, he said we can talk about it later; is that accurate?

A. I guess not in those words, but.

Q. Basically an accurate statement?

A. Well, the offer was Aiea High School.

Q. Right.

A. And then they wanted to consider Loveland. I mentioned that we could meet again to discuss a transition plan to Aiea High School.

Q. So that was the offer by [the Principal], correct?

A. Yes.

Tr. 224.

Likewise, the SSC admitted that the DOE had no behavior plan to deal with Greg I.'s obvious behavioral issues and needs. Tr. 217, 240. He acknowledged that "there's no behavior plan to tell an individual how to address each and every one of Greg's adverse behaviors." Tr.

15. There was testimony *at the administrative hearing* regarding Aiea High's physical characteristics, whether the DOE had a behavioral and crisis management plan, and whether a skills trainer would be sufficient to address potential harmful effects at Aiea High. But there is no evidence that such discussions occurred *at the IEP meetings*.

16. It is unclear whether Carrie I. is challenging the July 19, 2010 IEP's lack of a "transition plan"—addressing Greg I.'s move from a private to public setting—as an independent violation of the IDEA. To the extent such a challenge is made here, it fails. *See, e.g., Dep't of Educ. v. C.B.*, 2012 WL 1537454, at *5 (D.Haw. May 1, 2012) ("Nowhere is there a requirement that an IEP include a transition plan when a child moves from a private facility to a public school."). This "transition" issue differs from that discussed later regarding the IDEA'S requirements for a "transition plan" and transition services in moving from school to post-school, to post-secondary education, and to vocational activities. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(VIII) (providing that an IEP must address transition services for a child age sixteen and above to assist the child in reaching "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills").

240–41. There was no behavior support plan ("BSP"). Tr. 240. Instead, the DOE would rely on the goals and objectives in the July 19, 2010 IEP and on a one-on-one skills trainer. Tr. 239, 240–41. A BSP might have been developed later, when the transition needs would be discussed. Tr. 241,255. This lack of a BSP is a clear procedural violation. *See Park Hill Sch. Dist. v. Dass,* 655 F.3d 762, 766 (8th Cir. 2011) (acknowledging that a behavioral intervention plan can be required in certain circumstances, finding a violation, but considering the error harmless); *Sch. Bd. of Indep. Sch. Dist. No. 11 v. Renollett,* 440 F.3d 1007, 1011 (8th Cir.2006) (same). Likewise, the Aiea High Principal acknowledged that a crisis plan to deal with Greg I.'s seizures was not developed prior to, and as part of, the July 19, 2010 IEP. Tr. 254–55 ("I think those things would have been addressed during the transition plan that we never got an opportunity to do."). These failures further indicate that the potential "harmful effects" of the location were not considered prior to offering Aiea High as the LRE.

Aside from physical location, the DOE's more general rationale for Aiea High as the LRE was essentially to "mainstream" him. The DOE proposed a "small group setting with students with varying levels of competencies, some of which are higher functioning and have more language abilities than Greg in order to facilitate social interactions." Pet. 44. The SSC explained that "eventually [Greg's] going to have to be able to interact with peers . . . [who are] not disabled . . . [s]o he would benefit if he would be around many different types of people [at Aiea High's] setting." Tr. 236. In upholding the DOE's offer, the Hearings Officer reasoned:

> Student is 18 years old and would benefit from exposure to non-disabled peers, even if his oral communication abilities are limited. As his age, Student has few opportunities left to receive peer model-

ing in an educational setting. The Hearings Officer agrees with [the DOE's expert witness in autism] who testified that modeling is important as it teaches non-verbal things such as body language, personal space, social cues, hidden social cues, and to navigate one's environment.

AR Ex. 26, July 2011 Decl. at 17.

But the SSC admitted that the DOE did not discuss or consider potential "harmful effects" of such mainstreaming before offering that program in a placement at Aiea High. The SSC testified:

> Q  . . . . [D]o you know how [Greg I.] interacts—how he would or if he could interact with a nondisabled 18–year–old?
>
> . . . .
>
> A.  I'm not sure.
>
> Q.  You've never seen it, correct?
>
> A.  No.
>
> Q.  And it wasn't discussed at the IEP meeting, was it?
>
> A.  No, but that's why we have the goals and objectives that we're going to work on.
>
> . . . .
>
> Q  . . . . [W]as his ability to benefit from interaction with nondisabled peers discussed at the IEP meeting in formulating box 23 [regarding Greg I.'s LRE]?
>
> A.  During this box, no.

Tr. 236–37.

The evidence leaves no other conclusion: The DOE violated the requirement in § 300.116(d) to consider "any potential harmful effects" on Greg I. and "on the quality of services" that he needs when the DOE selected Aiea High as the LRE for the July 19, 2010 IEP. Similarly, the DOE violated § 300.324(a)(2)(i) in failing to have a BSP as part of that IEP.

Perhaps it would be best to attempt to mainstream Greg I. now. Perhaps Greg I.

should be exposed to non-disabled peers more than he has been at Loveland as he prepares to leave the educational system. And perhaps a goal of independence and employment is aspirational. But it is not this court's role to decide what's "best" for Greg I., or to decide whether Loveland or a DOE setting like Aiea High would be better for him in the short or long term. *See, e.g., Rowley,* 458 U.S. at 207, 102 S.Ct. 3034 ("[C]ourts must be careful to avoid imposing their view of preferable educational methods upon the States. The primary responsibility for formulating the education to be accorded a [disabled] child, and for choosing the educational method most suitable to the child's needs, was left by the [IDEA] to state and local educational agencies in cooperation with the parents or guardian of the child.") (footnote omitted). Rather, the court must focus on whether the IDEA's statutory and regulatory provisions were violated, and whether the proper *process* was followed in making it determinations. The DOE has not done so here—it violated §§ 300.116(d) and 300.324(a)(2)(i).

### 3. Transition Services Errors

Lastly, Carrie I. raises "transition services errors"—procedural violations of the IDEA in failing to consider, develop, and offer an IEP that addressed Greg I.'s unique needs as he transitions from an educational setting to his life as an adult.[17] She argues that the DOE violated specific statutory and regulatory provisions of the IDEA in both the July 19, 2010 IEP's offer of transition services, and in the make up of Greg I.'s IEP team. The court considers each aspect of this claim, and agrees that the IDEA was violated.

### a. The July 19, 2010 IEP's offer of "transition services"

A proper IEP must address "transition services." Specifically,

[t]he IDEA requires every IEP, beginning no later than the one that will be in effect when the child is 16 years old, to include "appropriate measurable post-secondary goals based on age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills," and to describe the "transition services (including courses of study) needed to assist the child in reaching those goals."

*Bd. of Educ. of Township High Sch. Dist. No. 211 v. Ross,* 486 F.3d 267, 275–76 (7th Cir.2007) (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa)-(bb)); *see also* 34 C.F.R. § 300.320(b).[18] These provisions

---

17. Again, as noted earlier, the issue is not whether the July 19, 2010 IEP fails to have a transition plan for Greg I.'s move from a private to a public placement. There is no such specific requirement in the IDEA. *See, e.g., C.B.,* 2012 WL 1537454, at *5 ("Nowhere is there a requirement that an IEP include a transition plan when a child moves from a private facility to a public school."); *James M. v. Haw. Dep't of Educ.,* 803 F.Supp.2d 1150, 1164 (D.Haw.2011) ("[T]he statutory provision of the IDEA specifically addressing transition services does not mandate such services when a transition from private to public school takes place.") (citations omitted). Rather, the issue is planning for transition services from an educational setting to a non-educational setting. *See* 20 U.S.C. § 1401(34)

(defining the term "transition services" to mean, in part, "a coordinated set of activities for a child with a disability that ... is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including post-secondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation").

18. Section 300.320 provides:

(b) Transition services. Beginning not later than the first IEP to be in effect when the child turns 16, or younger if determined appropriate by the IEP Team, and updated

are not optional. *See Ross,* 486 F.3d at 276 ("The statute does not grant the school district any discretion regarding whether to include a transition plan in the IEP.").

This "transition services" requirement was added to the IDEA in 2004, as part of the Individuals with Disabilities Education Improvement Act ("IDEIA"), P.L. 108–446, 118 Stat. 2647 (Dec. 3, 2004). In passing the IDEIA, among other findings, Congress found that "[a]s the graduation rates for children with disabilities continue to climb, providing effective transition services to promote successful post-school employment or education is an important measure of accountability for children with disabilities." *Id.* § 682 (codified at 20 U.S.C. § 1400(c)(14)). Congress in the IDEA placed "added emphasis on transition services so that special education students leave the system ready to be full productive citizens, whether they choose to go on to college or a job." 150 Cong. Rec. S11653–01, S11656 (Nov. 19, 2004) (Conf. Rep. accompanying H.R. 1350) (Statement of Sen. Dodd). Among its many changes, the IDEIA is supposed to "enhance[ ] planning and transition services for children with disabilities," *id.* at S11655 (statement of Sen. Reed), and "significantly improve[ ] transition services to ensure that students with disabilities are prepared for postsecondary education or employment." *Id.* at S11659 (statement of Sen. Bingaman).

The IDEA thus requires an IEP to have "measurable postsecondary goals" that must be "based on age appropriate transi-

tion assessments[.]" 34 C.F.R. § 300.320(b). It must include the "transition services (including courses of study) needed to assist the child in reaching those goals." *Id.* Notably, the requirement for "age appropriate transition assessments" was one of the specific additions Congress added to the IDEA in 2004. The *prior* version of the statute required an IEP to have "beginning at age 16 (or younger, if determined appropriate by the IEP Team), a statement of needed transition services for the child, including, when appropriate, a statement of the interagency responsibilities or any needed linkages[.]" 20 U.S.C. § 1414(d)(1)(A)(vii)(II) (2004). The prior version did not, however, require "transitions assessments" or an IEP to have "measurable postsecondary goals." [19]

██ Greg I.'s July 19, 2010 IEP fails to comply with the current version of the "transition services" requirement. As set forth earlier, the relevant section of the July 19, 2010 IEP is entitled, "Beginning at Age 16 Years, or Younger if Appropriate, A Statement of Needed Transition Services and, if Appropriate, a Statement of Interagency Responsibilities or Any Needed Linkages." Pet. 30. This language, however, refers verbatim to the old (pre–2004) statutory requirement.

Applying current standards, the "transition services" section of the July 19, 2010 IEP fails to include the "measurable postsecondary goals." Likewise, it fails to include a statement of "transition services (including courses of study) needed to as-

---

annually, thereafter, the IEP must include—
    (1) Appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills; and
    (2) The transition services (including courses of study) needed to assist the child in reaching those goals.

**19.** *Compare Lessard v. Wilton Lyndeborough Coop. Sch. Dist.,* 518 F.3d 18, 25–26 (1st Cir.2008) (affirming finding of no violation, applying the pre–2004 version of the IDEA, where an IEP failed to have a complete statement of transition services, because the old version of the IDEA "[did] not require a stand-alone transition plan as part of an IEP").

sist the child in reaching those goals." *See* 34 C.F.R. § 300.320(b). And the DOE admitted at the hearing that no assessments were done in preparing this "transition services" section of the July 19, 2010 IEP. In this regard, the SSC testified at the administrative hearing as follows:

Q. ... [D]id they give Greg an inventory on his interests?

A. No.

Q. So what would be ... it says get a job of his interest, what would that be?

A. We're not sure at this point. We would have to get an interest inventory or some sort of like assessment done.

Q. That wasn't done prior to ... June 30th or July 19, 2010?

A. No.

Tr. 228. Necessarily, then, the July 19, 2010 IEP was not "based on age appropriate transition assessments" as required by the post–2004 IDEA. The failure to comply with the IDEA's "transition services" provisions constitutes a clear violation of the IDEA. *See Ross,* 486 F.3d at 276; *see also Dass,* 655 F.3d at 766 (recognizing that an IEP is required to address "transition services" under 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)); *Dracut Sch. Comm. v. Bureau of Special Educ. Appeals of the Mass. Dep't of Elementary & Secondary Educ.,* 737 F.Supp.2d 35, 49–50 (D.Mass.2010) (finding school district violated 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa) and 34 C.F.R. § 300.320(b) by not conducting appropriate transition assessments).

Simply put, although the DOE might have complied with the "transition services" provision as is was in 2004, it failed to comply with the law as it is currently written.

### b. *Transition services participants on the IEP team—No DVR invited*

The IDEA requires certain individuals to be members of a disabled child's IEP team. *See generally* 34 C.F.R. § 300.321. It also sets forth requirements for "transition services participants" on an IEP team. In particular, the IDEA's regulations provide that

[t]o the extent appropriate, with the consent of the parents or a child who has reached the age of majority ... the public agency must invite a representative of any participating agency that is likely to be responsible for providing or paying for transition services.

34 C.F.R. § 300.321(b)(3).

▪ Here, it is undisputed that the "participating agency that is likely to be responsible for providing or paying for transition services" is the State Department of Vocational Rehabilitation, or "DVR." It is also undisputed that the SSC failed to invite a DVR representative to the IEP meeting (and, likewise, failed to seek the consent of Greg I.'s parents) as required by § 300.321(b)(3). It cannot seriously be disputed that it was not "appropriate" to invite a DVR representative where a goal of the July 19, 2010 IEP was to "mainstream" Greg I., and begin transitioning him to a post-educational setting. Given a disabled child who has been attending Loveland since age six, it certainly was "appropriate" to invite a DVR representative to begin to understand what range of vocations Greg I. might begin to qualify for (if any), especially if a goal was to "get a job of his interest." Indeed, the SSC admitted forthrightly that it was the DOE's responsibility to invite a DVR representative and that DOE failed to do so. He testified:

Q. ... On the middle column [of the transition services section of the IEP] it has teacher will assist stu-

dent and family in a DVR process. What does DVR stand for?

A. Division vocational rehabilitation.

Q. And were they invited to attend this [IEP] meeting?

A. No.

Q. Why not?

A. I didn't think about it at the time.

Tr. 199.

Q. Under [the transition services section of the IEP] "Teacher need—will assist student and family in the DVR process." ... And then the responsible agency and linkage is not completed there, correct?

A. Well, I'm not sure what I was supposed to put there. I guess I could have put DVR.

Q. But it's not put there, is there?

A. No.

Q. You stated that you could not invite the DVR people of another agency without getting consent from the parent; is that your statement?

A. Well, I said I didn't think about it. It didn't occur to me to invite them, but I would need permission to invite them also.

Tr. 229.

Q. Isn't it the responsibility of the [DOE] to provide a transition plan for post-secondary goals?

A. Yes, it is.

Q. And isn't it the department's responsibility to assure that the plan is completed and carried out?

A. Yes.

Q. So wouldn't it be the [DOE's] responsibility to invite these people?

A. ... DVR, I should have invited[.]

Tr. 231. In short, the DOE violated 34 C.F.R. § 300.321(b)(3).

### 4. The Procedural Violations Were Not Harmless and Thus Denied Greg I. a FAPE

The court has found several procedural violations of the IDEA—the failure of the IEP team to consider potential harmful effects of the LRE, the failure to consider behavioral issues (no BSP), the failure to comply with transition services requirements, and the failure to invite a DVR representative to the IEP meetings. The court must next address whether the violations were harmless. That is, even "if the IDEA's procedures are violated, the next question is whether that violation denied that student a FAPE—for not all procedural violations are actionable." *Dep't of Educ., State of Haw. v. M.F.*, 840 F.Supp.2d 1214, 1226 (D.Haw.2011) (citations omitted). The procedural violation must result in the "loss of [an] educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process." *Capistrano Unified Sch. Dist.*, 556 F.3d at 909.

In this regard, the burden remains on Carrie I. to prove that the procedural violations were not harmless. That is, if a plaintiff demonstrates a procedural error, the DOE does not have to prove that the error was harmless—the plaintiff still has to prove that the error was *not* harmless. *See Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 994–95 (1st Cir.1990) (rejecting argument that "the district court should have shifted the burden to [the school district] to demonstrate that the alleged procedural defects ... were harmless" and holding that "[t]he court below correctly imposed the devoir of persuasion on the complainants in respect to the harmfulness of the claimed procedural shortcomings").

The procedural violations here were blatant. The DOE admitted it did not consider the potential harmful effects

of the LRE. As to transition services, the DOE appears not to have recognized a change in law that occurred seven years ago. The offering of transition services was essentially nonexistent; it was a "lost educational opportunity." *Capistrano Unified Sch. Dist.*, 556 F.3d at 909. Although it remains speculative what would have occurred if the DOE had invited a DVR representative (who may have declined the invitation), the *opportunity* to have a representative during preparation of the July 19, 2010 IEP was certainly lost.

It is also undisputed that no assessments were conducted as required under 34 C.F.R. § 300.320(b)(1) in considering transition services. The lack of assessments alone is enough to constitute a lost educational opportunity. Indeed, in this precise context, a court found a denial of FAPE, reasoning that "[a] procedural fault rises to [a denial of FAPE] when a school fails to conduct proper assessments and then provides inadequate services." *Dracut Sch. Comm.*, 737 F.Supp.2d at 49 (citing *N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1210 (9th Cir.2008) ("[W]ithout evaluative information that C.B. has autism spectrum disorder, it was not possible for the IEP team to develop a plan reasonably calculated to provide ... meaningful educational benefit[.]")); *compare Ross*, 486 F.3d at 275–76 (affirming finding of procedural violation in failing to comply with § 300.320(b)(1), but holding violation harmless, *i.e.*, no loss of educational opportunity, because student "was not in a position to benefit from an elaborate transition plan including advanced vocational or educational skills").

Moreover, even if there were no "lost educational opportunity," the procedural violations—failing to consider potential harmful effects of an LRE, and to offer transition services—were also not harmless under the second prong of the test: Greg I.'s "parents' opportunity to participate in the IEP formulation process" was certainly "seriously infringed." *Capistrano Unified Sch. Dist.*, 556 F.3d at 909. With no discussion about potential harmful effects of the LRE, with no discussion about transition services, and with no assessments upon which to base those transition services, Carrie I. was denied *any* opportunity to participate in those processes in determining the LRE and its placement. *Id.*

Again, remember the context: The DOE proposed to move a severely disabled individual from a small mental health treatment facility where he had been for eleven years (since age six) to a very different, large public school campus, specifically so he could be more exposed to non-disabled peers. The DOE proposed to change his placement, change his location, and change his environment. It proposed to prepare him to transition towards laudable (even if only aspirational) goals of independence and possible employment. But it proposed to do all this without an evaluation, without an assessment, without considering the potential harmful effects, without inviting a vocational professional to IEP meetings, and without even meeting him—all with only a half-hour of first-hand observation. Even if the DOE understandably relied primarily on input from those at Loveland who knew him best, the DOE must still follow the IDEA's procedures.

Given Greg I.'s placement history and the nature of the DOE's proposed move, it is obvious that if the DOE was considering his unique needs, then the IEP meetings and placement decisions should have focused on change and transition—a move from a private to a public placement generally, from Loveland to Aiea High specifically, and from an educational setting to adult life. Under these circumstances, the DOE's procedural violations cannot be deemed harmless.

In short, the DOE violated IDEA procedures, depriving Greg I. of educational opportunities and seriously infringing on his parents' opportunity to participate in formulating important aspects of the July 19, 2010 IEP. Greg I. was denied a FAPE. And, in stark contrast, on the record before it, the court finds that a private placement at Loveland is certainly appropriate.

## V. *CONCLUSION*

The court assumes the best intentions of the DOE in wanting to move Greg I. to a public placement at Aiea High: a concern he was not making academic progress at Loveland, a concern that long-term separation from non-disabled peers was inconsistent with the IDEA's mainstreaming ideal, a concern that he should be more exposed to his peers in the community as he moved towards goals of independence and employment, and a belief that the DOE could offer adequate services and fulfill *Rowley's* standard of "meaningful progress." Nevertheless, in striving towards those goals, the DOE clearly violated several IDEA procedures and failed to create an IEP that adequately addressed those concerns. The July 19, 2010 IEP failed to consider Greg I.'s unique needs and circumstances, and denied him a FAPE under the IDEA.

Accordingly, the July 5, 2011 Findings of Fact, Conclusions of Law, and Decision of the Hearings Officer is REVERSED. The Clerk of Court shall enter judgment in favor of Plaintiff Carrie I., on behalf of her son, Greg I., and against Defendant Department of Education, State of Hawaii.

IT IS SO ORDERED.